

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-15-00633-CV

**LSREF2 COBALT (TX), LLC**,
Appellant

v.

**410 CENTRE LLC**, and John B. Urbahns,
Appellees

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2013CI20922
Honorable Michael E. Mery, Judge Presiding

Opinion by:   Karen Angelini, Justice

Sitting:   Karen Angelini, Justice
Patricia O. Alvarez, Justice
Jason Pulliam, Justice

Delivered and Filed:  July 6, 2016

REVERSED AND REMANDED

LSREF2 Cobalt (TX), LLC sued 410 Centre LLC and John B. Urbahns to recover a deficiency on a note following a foreclosure sale. The matter was tried to the court. The trial court applied the fair market value offset under Section 51.003 of the Texas Property Code to extinguish the deficiency and rendered a take-nothing judgment on Cobalt's claims. We conclude the trial court erred in applying the offset. We further conclude Cobalt conclusively proved the elements of its claims. We, therefore, reverse and remand to the trial court for entry of judgment.

**BACKGROUND**

In 2008, 410 Centre purchased commercial real property located in northeast San Antonio. As part of this transaction, 410 Centre borrowed $5.1 million and executed a promissory note. The loan was secured by the real property. Additionally, Urbahns guaranteed the note. 410 Centre and Urbahns waived their rights to relief from valuation and appraisement laws in the note and the guaranty. Specifically, in the note, 410 Centre agreed to the following waiver of statutory rights:

> 6. Valuation and Appraisement Laws. All principal, interest and other amounts payable under or with respect to this Note shall be payable without relief from valuation and appraisement laws.
>
> . . . .
>
> 13. Waiver and Consent . . . All guarantors . . . of this Note hereby waive generally and specifically, to the extent waivable, any and all rights that they may have, by contract, at equity or under any state or federal law, to any defense, offset, claim in recoupment or counterclaim not specifically set forth herein.

In the guaranty, Urbahns agreed to similar terms:

> 2. Guarantor agrees to pay to Lender, without relief from valuation and appraisement laws, all amounts payable under this Guaranty . . .
>
> 11. Guarantor hereby waives each of the following:
>
> . . . .
>
> (e) Any and all rights Guarantor may have under any anti-deficiency statute or other similar protections.

410 Centre eventually defaulted on the note.

In 2011, 410 Centre, Urbahns, and the current holder of the note entered into a forbearance agreement, which lasted for two years. After multiple assignments and transfers, Cobalt became the holder of the note and the beneficiary of the guaranty.

In 2013, the parties engaged in settlement negotiations. In October 2013, the parties entered into a pre-negotiation agreement. The parties did not reach a settlement. On November 5, 2013,

the real property was sold at foreclosure. At the time, the principal balance on the note exceeded $5 million. Cobalt bought the property at foreclosure through a credit bid in the amount of $2.8 million, leaving an unpaid balance or deficiency on the note in excess of $2.6 million.

Cobalt sued 410 Centre and Urbahns to recover the deficiency on the note. In its pleadings, Cobalt described its causes of action as a suit on a note and a suit on a guaranty. Cobalt alleged that 410 Centre executed a loan agreement and promissory note in the original principal amount of $5,100,000.00; that the note matured and 410 Centre failed to pay the amounts due and owing under the note; that Cobalt foreclosed on its security interest via credit bid in the amount of $2,800,000.00 and the proceeds of the foreclosure sale were applied to the note leaving a deficiency balance on the note; that *"[a]fter all just and lawful offsets and credits have been allowed*, there [was] a principal balance, plus accrued interest and charges through January 31, 2014, due and owing under the terms of the note in the amount of $2,402,164.47 with interest continuing to accrue at the rate of $527.06 per day from and including February 1, 2014, until the date judgment is entered." (Emphasis added). Cobalt made parallel allegations concerning the guaranty executed by Urbahns. Attached to the petition were the loan agreement, the note, and the guaranty. Cobalt also sought attorney's fees under the note, the guaranty, and Chapter 38 of the Texas Civil Practice and Remedies Code.

In their third amended answer, 410 Centre and Urbahns asserted the defense of "credit and offset" and, pursuant to section 51.003 of the Texas Property Code, asked the factfinder to determine the fair market value of the real property securing the note as of the date of the foreclosure sale.

At trial, Cobalt argued that 410 Centre and Urbahns had waived any and all defenses and offsets in the note and the guaranty, including the fair market value offset in section 51.003 of the Texas Property Code. In its case-in-chief, Cobalt called a single witness—its assistant vice-

president, Marissa McGaughey. McGaughey testified about the loan agreement, the promissory note, the guaranty, the forbearance agreement, the transaction history, the pre-negotiation agreement, the foreclosure sale, and the credit bid. McGaughey also testified about the amount of the outstanding principal balance on the note, the balance after the credit bid was applied, and the interest that had accrued. Additionally, Cobalt presented relevant documents, including the loan documents, the pre-negotiation agreement, and the transaction history. Cobalt then rested.

410 Centre and Urbahns then called their expert witness, real estate appraiser Don Canady, to testify about the market value of the property. Canady opined that the market value of the property at the time of foreclosure was $5,265,000.00. Urbahns also testified about the transaction.

After both parties rested and before rebuttal evidence was presented, the trial court stated:

> I have made a determination, based upon all of the documentary evidence . . . that any waiver of those rights under Chapter 51 of the property code, if any, that occurred [was], in fact, waived by the entry of the . . . pre-negotiation agreement. . . . explicitly . . . . provision number 3 which was actually initialed by Ms. McGaughey stating that the obligor has not in any way waived any rights or remedies it may have as a defense against any action by creditor against obligor or any other civil proceeding or otherwise, all that language there, because it said prior to that, now, therefore, the parties hereto agree as follows. The documents speak for themselves, but beyond that you have the testimony and clearly the parties were in negotiation.
>
> . . . .
>
> In any event, if there had been a waiver with all the loan documents, I find that that waiver was waived by [Cobalt]; therefore, before I can give you what you're asking for I have to determine fair market value. I can't just give you a judgment. I think [Cobalt] indicated [it] wanted to rebut on that issue.
>
> [I]f [Cobalt] ha[s] any evidence on [the fair market value] issue, you can bring it now.

On rebuttal, Cobalt called its expert witness, real estate appraiser Franklin Flato, who opined that the market value of the property was $3.3 million at the time of foreclosure.

The trial court applied the section 51.003 offset and rendered a take-nothing judgment on Cobalt's deficiency judgment claim. The trial court also rendered a take-nothing judgment on 410 Centre and Urbahns's wrongful foreclosure claim. Cobalt appealed.

## SECTION 51.003 OF THE TEXAS PROPERTY CODE

In Texas, when real property is sold at a foreclosure sale and an unpaid balance or deficiency on a note remains, the defendant may be entitled to an offset against the deficiency. TEX. PROP. CODE ANN. 51.003 (West 2014). Section 51.003 provides that if the factfinder determines that the fair market value of the property is greater than the foreclosure sale price, the party obligated on the debt may ask the court to offset the deficiency owed by the difference between the fair market value and the sale price. *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 5 (Tex. 2014). Section 51.003 is an affirmative defense, and the burden is on the defendant to raise the affirmative defense and to present evidence of fair market value. *See id*. at 3. The statute "is designed to ensure that debtors receive credit when their foreclosure property is sold at an unreasonably low price." *Id*. at 6. However, a party's rights under section 51.003 can be waived by a general waiver provision in a contract. *Id*.

## CONSTRUCTION OF THE PRE-NEGOTIATION AGREEMENT

In their briefing before this court, 410 Centre and Urbahns do not dispute that they waived the fair market value offset under section 51.003 in the note and the guaranty. The real controversy here involves the construction of the pre-negotiation agreement, which was executed after the note and the guaranty. Cobalt argues that when the pre-negotiation agreement is construed as a whole and in light of the circumstances surrounding its execution, it has no effect on the 410 Centre and Urbahns's prior waivers of section 51.003. Cobalt maintains that the trial court's construction of this provision—that it waived the prior waivers made by 410 Centre and Urbahns in the note and the guaranty—was erroneous. In response, 410 Centre and Urbahns argue that the unambiguous

language of Paragraph 3 of the pre-negotiation agreement revived 410 Centre's right to an offset under section 51.003. Paragraph 3 of the pre-negotiation agreement provides:

> 3. <u>No Waiver by Obligor</u>. [410 Centre and Urbahns] ha[ve] not in any way waived any rights or remedies it may have prior to and until the date of the Agreement with respect to the Loan or any of the Loan Documents, or otherwise available at law or in equity either directly in an action against Creditor, as a defense against any action by [Cobalt] against [410 Centre and Urbahns] or any other civil proceeding or otherwise.

The interpretation of an unambiguous contract is a question of law. *Moayedi*, 436 S.W.3d at 7. In construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *Id.* We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* All of the provisions must be considered with reference to the whole instrument. *Id.* No single provision taken alone is given controlling effect. *Id.*

Additionally, we construe a written contract "to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol evidence rule." *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011); *see PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 734 (Tex. App.—San Antonio 2014, pet. denied). "The [parol evidence] rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Exploration*, 352 S.W.3d at 469. These circumstances include the commercial setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties. *Id.*

We begin our analysis by examining the text of the pre-negotiation agreement. Paragraph 1 of the pre-negotiation agreement states in part:

> [N]o representation, offer, concession or statement made by any party during the course of the [Settlement] Discussions shall constitute a waiver by any party of any

rights, remedies, or defenses it may have, in any way modify or terminate any of Loan Documents, in any way modify the legal relationship of the parties as set forth in the Loan Documents, or result in an admission against the interest of any party, except to the extent the parties otherwise agree in a duly executed and binding written agreement pursuant to Section 4 below. . . .

It is expressly understood that each party reserves all legal and equitable rights and remedies . . . .

Thus, Paragraph 1 shows that the parties did not intend for the settlement discussions—in and of themselves—to alter the parties' legal rights, the parties' original agreements, or the parties' legal relationship.

Paragraphs 4 and 6 set forth specific procedures for modifying the loan documents. Paragraph 4 of the pre-negotiation agreement precludes any modification of the loan documents unless agreed to in writing, approved by Cobalt's resolution committee, and confirmed by its senior management. Paragraph 6 of the pre-negotiation agreement provides that the individuals engaging in discussions with 410 Centre and Urbahns have no authority to bind Cobalt and reiterates the formalities in Paragraph 4 required to modify the loan documents.

Paragraph 2 states:

2. No Waiver by Creditor. [Cobalt] has not in any way waived any rights or remedies it may have to insist on full performance by [410 Centre and Urbahns] of all obligations under the Loan Documents or any rights or remedies available to it thereunder or otherwise available at law or in equity.

Paragraph 5 states in part:

[N]othing contained in this Agreement is intended (i) to limit or otherwise affect [Cobalt's] rights or [Cobalt's] ability to initiate or otherwise proceed to exercise any rights or remedies it may have before, during or after Discussions, if any, including, but not limited to, giving notices of default or initiating foreclosure proceedings; or (ii) to relieve [410 Centre and Urbahns] of any obligations it has under the Loan Documents.

Both Paragraphs 2 and 5 state that Cobalt is preserving its rights and remedies under the original loan documents, and Paragraph 5 states that nothing in the pre-negotiation agreement

relieves 410 Centre and Urbahns of their obligations under the loan documents. Paragraphs 2 and 5 demonstrate the parties' intention to maintain the status quo under the loan documents, not to alter it. When Paragraph 3 is construed as the trial court construed it—to modify 410 Centre and Urbahns's waiver of the statutory offset in the loan documents and the guaranty—Paragraphs 2 and 5 are rendered meaningless. Thus, the trial court's construction of the pre-negotiation agreement was erroneous because it failed to harmonize and give effect to all provisions of the agreement. *See Moayedi*, 436 S.W.3d at 7.

Additionally, Paragraph 1 says the parties are not intending to alter the loan documents and guaranty unless specific procedures for modifying the agreements are carried out. These specific procedures for modifying the loan documents and guaranty are set out in Paragraphs 4 and 6. When considered as a whole, the text of the entire pre-negotiation agreement shows the parties did not intend the pre-negotiation agreement itself to alter their previous agreements in any way.

The commercial setting and other objective factors surrounding the pre-negotiation agreement further support this construction. The parties' original agreements included waivers of any and all defenses and offsets by 410 Centre and Urbahns. The original agreements remained in place for five years. On the eve of foreclosure, the parties engaged in settlement negotiations. The pre-negotiation agreement, by its express terms, sets parameters for these negotiations and specifies precise procedures for modifying the loan documents and the guaranty. Thus, the commercial setting and other objective factors indicate that the pre-negotiation agreement was a stand-alone agreement that did not alter the parties' legal rights under the existing agreements.

Even if we were permitted to consider Paragraph 3 in isolation, we conclude its text does not operate to revive 410 Centre and Urbahns's rights to an offset under section 51.003. Paragraph 3 provides that 410 Centre and Urbahns "ha[ve] not in any way waived any rights or remedies [they] *may have* prior to and until the date of this Agreement. . . ." (Emphasis added). This language

preserves any rights 410 Centre and Urbahns possessed prior to and until the date the pre-negotiation agreement was signed, but it does not grant them rights they did not have. At the time the pre-negotiation agreement was signed, 410 Centre and Urbahns did not have a right to an offset under Section 51.003 because they had waived that right in the note and the guaranty. Thus, the parties' prior agreements that 410 Centre and Urbahns would pay the debt "without relief from valuation and appraisement laws" were unaffected by Paragraph 3 of the pre-negotiation agreement.[1]

In their brief, 410 Centre and Urbahns argue that the pre-negotiation agreement revived their rights to assert a fair market value offset under section 51.003 because (1) the unambiguous language of Paragraph 3 shows it; (2) the trial court's construction of Paragraph 3 comports with the rest of the pre-negotiation agreement; (3) the circumstances surrounding the pre-negotiation agreement support this construction of the pre-negotiation agreement; and (4) the pre-negotiation agreement controls over earlier agreements.

We reject the first three arguments based on our prior analysis of the text and the circumstances surrounding the pre-negotiation agreement. In the fourth argument, 410 Centre and Urbahns contend this case falls under the general rule that when parties enter into a second contract dealing with the same subject matter without stating whether the second contract operates to discharge or substitute the second contract, the two contracts are interpreted together and the latter contract prevails to the extent they are inconsistent. *See Midwest Med. Supply Co., L.L.C. v. Wingert*, 317 S.W.3d 530, 537-38 (Tex. App.—Dallas 2010, no pet.). We reject this argument as well. As previously discussed, the express language of the pre-negotiation agreement shows that

---

[1] 410 Centre and Urbahns also argue that Paragraph 3 modified the parties' prior agreements because McGaughey initialed it. We disagree. Paragraph 3 does not state that the parties' are modifying their prior agreements and McGaughey's initials do not change this fact.

the parties did not intend for the pre-negotiation agreement to alter the parties' previous agreements, legal rights, or legal relationship in any way. Furthermore, the pre-negotiation agreement expressly provides that the loan documents would not be modified "except to the extent the parties otherwise agree in a duly executed and binding written agreement pursuant to Section 4 . . . ." The rule cited by 410 Centre and Urbahns is therefore inapplicable here. *See DeWitt Co. Elec. Co-op, Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999) (stating that the rule that all writings pertaining to the same transaction are considered together "is simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily.").

We conclude that the pre-negotiation agreement, when construed as a whole and in light of the surrounding circumstances, did not modify the note or the guaranty. The pre-negotiation agreement had no effect on 410 Centre and Urbahn's previous waivers of section 51.003. Therefore, the trial court erred in applying an offset under section 51.003 to extinguish the deficiency on the note.

### ALTERNATIVE BASIS FOR AFFIRMING THE JUDGMENT: THE PLEADINGS

410 Centre and Urbahns assert that even if the trial court erred in construing the pre-negotiation agreement, the take-nothing judgment against Cobalt must be affirmed based on a defect in Cobalt's pleadings.

410 Centre and Urbahns pleaded section 51.003's offset as an affirmative defense. Citing Rule 94 of the Texas Rules of Civil Procedure, 410 Centre and Urbahns argue that Cobalt's failure to file additional pleadings in response to their affirmative defense precluded Cobalt from claiming that 410 Centre and Urbahns waived their section 51.003 offset in the note and the guaranty. In response, Cobalt argues it was not required to file additional responsive pleadings under the circumstances presented. Cobalt maintains that it was suing to enforce agreements that waived section 51.003, and these waivers were an integral part of its deficiency claim.

Rule 94 requires specific defenses and any matter constituting an avoidance or an affirmative defense to be set forth affirmatively in a responsive pleading. *Zorrilla v. Aypco Constr. II, L.L.C.*, 469 S.W.3d 143, 155 (Tex. 2015). Specifically, Rule 94 provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . waiver, and any other matter constituting an avoidance or affirmative defense." TEX. R. CIV. P. 94. Generally, when a party fails to expressly plead an affirmative defense or a matter in avoidance, the party cannot rely on it. *Zorilla*, 469 S.W.3d at 155. This rule is not limited to defendants; it applies to all parties. *Royal Typewriter Co. v. Vestal*, 572 S.W.2d 377, 378 (Tex. Civ. App.—Houston [14th Dist.] 1978, no writ). "The purpose of requiring the pleading of affirmative defenses is to put the other party on notice of the matters to be relied on and to enable him to ascertain what proof he may need to meet such defenses." *Id*.

We conclude that Cobalt was not required to allege waiver of the section 51.003 offset in an additional, responsive pleading. In this case, Cobalt was not alleging waiver of section 51.003's offset as an affirmative defense or as a matter in avoidance. Therefore, Rule 94 does not apply here. Cobalt's pleadings show it was seeking enforcement of the promises 410 Centre and Urbahns made in the guaranty agreement—payment of amounts owed without offset. In its petition, Cobalt stated it was suing to collect the amounts owed under the note and guaranty without a fair market value offset. Specifically, Cobalt alleged that the original principal amount of the note was $5,100,000.00; it foreclosed on the property "via credit bid in the amount of $2,800,000.00;" and it was "entitled to recover all monies due and owing under the terms of the note." Cobalt further alleged that "[*a]fter all just and lawful offsets and credits have been allowed*, there is a principal balance, plus accrued interest and charges through January 31, 2014, due and owning under the terms of the note in the amount of $2,402,164.47, with interest continuing to accrue at the rate of $527.06 per day." (Emphasis added). In light of these allegations, Cobalt was not required to file

yet another pleading asserting 410 Centre and Urbahns waived the section 51.003 offset. 410 Centre and Urbahns were on notice of Cobalt's contention that 410 Centre and Urbahns had waived section 51.003 in the note and the guaranty.

410 Centre and Urbahns rely on *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex. 1992), to support their argument that a responsive pleading was required in this case. In *T.O. Stanley*, a bank sued to recover on a note and a guaranty. The guarantors raised the affirmative defense of impairment of collateral, and the bank countered that this defense was waived in the guaranty. *Id*. The Texas Supreme Court concluded the bank was raising waiver as an affirmative defense, and because the bank failed to plead waiver as an affirmative defense under Rule 94, it had lost its right to argue that the guarantors waived their impairment of collateral defense. *Id*. However, absent from the court's discussion was any detailed information about the bank's initial pleadings or how it alleged its claims. *Id*.

*T.O. Stanley* is distinguishable from the present case. As previously discussed, Cobalt was not alleging waiver of section 51.003's offset as an affirmative defense or as a matter in avoidance, but as an integral part of its claims. The face of Cobalt's petition alleged that no offsets were applicable under the note and the guaranty. Cobalt expressly pled the amount due under the note, the amount of the credit bid at the foreclosure sale, and the total amount of the deficiency "after all just and lawful offsets and credits have been allowed." Cobalt also attached to its petition the note and the guaranty which waived all defenses and offsets. Based on these pleadings, 410 Centre and Urbahns were well aware of Cobalt's position that they were not entitled to an offset under section 51.003.

We conclude that Cobalt's pleadings were not defective, and therefore, the trial court's take-nothing judgment cannot be affirmed on this basis.

**COBALT'S PROOF**

Having determined the trial court erred in applying section 51.003's fair market value offset to extinguish any deficiency, we must determine whether Cobalt conclusively established the elements of its claims.

To recover a deficiency on a note, Cobalt had to establish (1) the note in question, (2) that 410 Centre signed the note, (3) that Cobalt was the legal owner and holder of the note, and (4) that a certain balance was due and owing on the note. *See Hudspeth v. Investor Collection Servs. Ltd. P'ship*, 985 S.W.2d 477, 479 (Tex. App.—San Antonio 1998, no pet.); *Clark v. Dedina*, 658 S.W.2d 293, 295-96 (Tex. App.—Houston [1st Dist.], writ dism'd). To recover on the guaranty, Cobalt had to establish (1) the existence and ownership of the guaranty contract, (2) the terms of the underlying contract by the holder, (3) the occurrence of the conditions upon which liability is based, and (4) the failure or refusal to perform the promise by the guarantor. *See Lee v. Martin Marietta Materials Sw., Ltd.*, 141 S.W.3d 719, 720-21 (Tex. App.—San Antonio 2004, no pet.).

Here, the note and the guaranty were admitted at trial. In his testimony, Urbahns conceded not only the existence of the note but also the validity of the signatures on the note and the guaranty. Multiple documents were admitted to show the transfer of the note from the original lender to Cobalt and the assignment of the guaranty to Cobalt. Additionally, McGaughey testified that Cobalt was the current owner and holder of the note and the beneficiary of the guaranty. Evidence and testimony were admitted showing the loan was not paid off when it matured on September 30, 2011. Additionally, Urbahns testified that the loan was not paid off during the two-year forbearance period, nor was it paid off when the forbearance period expired on September 30, 2013. The "Successor Trustee's Deed and Bill of Sale" was admitted into evidence showing that the property securing the debt was purchased by Cobalt for the sum of $2,800,000.00. McGaughey testified that on the date of sale the total indebtedness including principal and interest was

$5,154,201.78, and after crediting the foreclosure sales price, the deficiency due and owing on the note was $2,402,164.47 as of January 31, 2014. McGaughey further testified that from January 31, 2014 forward, interest continued to accrue on the judgment at the rate of $527.06 per day.

At trial, 410 Centre and Urbahns claimed they did not owe anything on the note and the guaranty because the value of the property exceeded the balance on the note. Thus, 410 Centre and Urbahns asserted a fair market value offset under section 51.003, but they did not otherwise dispute the amounts owed.

Finally, the parties stipulated to the amount of attorney's fees to be awarded at trial and on appeal.

On appeal, 410 Centre and Urbahns argue that Cobalt failed to conclusively establish its claims because it did not prove that the foreclosure was properly conducted and that Cobalt was the "holder" of the guaranty. But these arguments are not directed at elements of Cobalt's claims. Cobalt was not required to prove that the foreclosure was properly conducted in order to recover on the note.[2] *See Hudspeth*, 985 S.W.2d at 479 (listing the elements to recover a deficiency on a note); *Clark*, 658 S.W.2d at 295-96 (same). Nor was Cobalt required to prove that it was the "holder" of the note in order to recover under the guaranty. A guaranty is not a negotiable instrument. *See* TEX. BUS. & COM. CODE ANN. § 3.104(a) (West Supp. 2015). Thus, Cobalt was not required to prove it was the "holder" of the guaranty. The evidence, however, did conclusively establish that the guaranty was assigned to Cobalt.

---

[2]The burden was on 410 Centre and Urbahns to establish a claim for wrongful foreclosure. To establish wrongful foreclosure, 410 Centre and Urbahns had to establish (1) a defect in the foreclosure sale proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price. *See Leeder v. Wells Fargo Bank, N.A.*, No. 04-13-00380-CV, 2014 WL 1714080, at *5 (Tex. App.—San Antonio 2014, no pet.). The trial court rendered a take-nothing judgment on 410 Centre and Urbahn's claims for wrongful foreclosure. 410 Centre and Urbahns did not appeal the trial court's judgment. *See* TEX. R. APP. P. 25.1(c) (requiring a party who seeks to alter the trial court's judgment to file a notice of appeal).

We conclude that Cobalt conclusively established its claims on the note and the guaranty and its claim for attorney's fees.

## CONCLUSION

The trial court erred in applying an offset under section 51.003 to extinguish the deficiency on the note. Cobalt conclusively established its claims. Therefore, we reverse the trial court's judgment and remand this cause to the trial court for the sole purpose of entering a judgment consistent with this opinion.

Karen Angelini, Justice